Filed 2/17/16  P. v. Simpson CA6

**NOT TO BE PUBLISHED IN OFFICIAL REPORTS**

**California Rules of Court, rule 8.1115(a), prohibits courts and parties from citing or relying on opinions not certified for publication or ordered published, except as specified by rule 8.1115(b).  This opinion has not been certified for publication or ordered published for purposes of rule 8.1115.**

IN THE COURT OF APPEAL OF THE STATE OF CALIFORNIA

SIXTH APPELLATE DISTRICT

| | |
|---|---|
| THE PEOPLE,<br><br>　　　Plaintiff and Respondent,<br><br>　　　　　v.<br><br>CHARLES GRANT SIMPSON,<br><br>　　　Defendant and Appellant. | H040725<br>(Santa Clara County<br>Super. Ct. No. C1353898) |

A jury convicted defendant Charles Grant Simpson of assault with a deadly weapon, a felony (Pen. Code, §245, subd. (a)(1)),[1] and annoying or molesting a child, a misdemeanor (§ 647.6, subd. (a)(1)).  In a separate trial, the court found true the allegation that defendant had suffered a prior serious or violent felony conviction, i.e., a strike (§§ 667, subd. (b), 1170.12, subd. (c)(1)).  The court sentenced defendant to an aggregate prison term of 11 years.

On appeal, defendant argues prosecutorial error caused the jury to convict him of the misdemeanor annoying or molesting a child (child annoyance) offense.  Specifically, defendant contends the prosecutor improperly argued to the jury there was evidence it did not hear that showed defendant had an unnatural or abnormal sexual interest in children, and the trial court erred by failing to give a curative instruction that no such evidence had

---

[1] Further statutory references are to the Penal Code unless otherwise stated.

been withheld from the jury. We conclude there was no prosecutorial error and will affirm the judgment.

FACTS

*I.      Prosecution Evidence*

Madison S., who was 13 years old at the time of the incident in April 2013, lived with her mother and sister at Saratoga Springs, a campground/trailer park in Saratoga. Don and Luana Kellar lived close by. Madison described Luana[2] as her "best friend." Madison had met defendant approximately three times, including the last time she saw him in April 2013.

Madison testified that on the evening of April 5, 2013, she was visiting the Kellars at their home. Defendant's son (who was engaged to the Kellars' daughter) was also there. Defendant arrived unexpectedly with a friend, saying he was there to see his son. When defendant greeted everyone, he asked Madison and Luana for a hug. When defendant asked Madison for a hug, she gave him one. He helped her up from where she was sitting on the floor by a fireplace and hugged her around her ribcage. Madison testified that although she originally thought it was just "a casual hug, . . . when [she] went to pull away, he kissed [her] neck and licked [her] . . . jawline." Madison backed away from defendant because he scared her. She testified she could discern that defendant had kissed her because she could hear the kiss, and she could tell he licked her because she felt his tongue.

Madison believed no one else saw what had occurred. Defendant "just kept smiling" and did not apologize to Madison. After Madison sat down, defendant asked Luana for a hug. Approximately five minutes later, after defendant left the house, Madison told Luana what had happened.

---

[2] We refer to Luana and Don Kellar by their first names for clarity.

2

Madison testified on cross-examination that based upon her observations, defendant "was drunk, but [she did not] believe his actions were of a drunk man." He slurred his words when he spoke to Madison, and he was stumbling.

Luana Kellar testified that defendant arrived at her home at around 9:00 p.m. on April 5. He did not hug anyone when he first arrived. Luana went outside for a cigarette and Madison and defendant followed her. When Luana was about to go inside, defendant asked her repeatedly to give him a hug, but Luana declined.

Luana testified that after they returned inside, and defendant "was mad [be]cause [Luana] wouldn't give him a hug . . . Madison got up and said, 'I'll give you a hug.' " Luana observed the entirety of the hug, initially from her seated position by the fireplace and later as she was walking to the kitchen. At first, defendant started rocking back and forth. Then, as Luana was passing them, defendant kissed Madison on the cheek and licked her neck. Madison pushed defendant away and followed Luana into the kitchen. Luana tried to calm Madison and told her she (Madison) needed to go home. At that time, Madison's mother was calling for Madison to come home, so Madison left the Kellars' house. Don returned to the living room and sat down with Luana. Luana told Don what had happened and said defendant needed to leave. Defendant came back into the living room and was still upset, asking Luana why she would not give him a hug. He said, " 'If Don wasn't here, you'd be all over this.' " Luana understood this statement to have been made in a sexual context. Defendant then sat down on the couch, pointed at his lap, and said, " 'You want this?' " Don, who was also sitting on the couch, said to defendant, " 'That's it. You need to leave.' "

Don got up, approached defendant, knelt down, and said, " [']You need to get your fat f'ing ass up and get out of my house.['] " After defendant responded that "[w]e're brothers and family," Don said he knew what defendant had done to Madison, and he did not like the way he (defendant) had talked to his wife. Don again told defendant it was time for him to leave. Defendant threw two punches at Don, striking

3

him on the arm and on the right side of the head. Defendant then reached down, picked up a beer bottle from the floor, and "cracked Don [on] the head with it." Don grabbed his head, was dazed, and tripped over the arm of the couch and fell to the floor. Defendant punched Don repeatedly while he was on the floor.

Luana tried to call 911 but had no cell phone reception. She then ran outside and asked a neighbor to call 911. When Luana returned, defendant was still punching Don, even though defendant's son was urging him to stop and to leave the home.

On cross-examination, Luana testified that according to the report of the Santa Clara County Sheriff's Office, she told a deputy sheriff she had been told by Madison that defendant had kissed and licked her rather than witnessing the incident itself. Luana said she was upset when she was interviewed; was concerned about her husband; and did not recall what she had told the deputy sheriff concerning Madison. She also testified on cross-examination that defendant "was obviously under the influence" during his visit.

Don also testified for the prosecution. His testimony was consistent with Luana's. He testified that after defendant and his friend arrived on the evening of April 5, there was a period of time that Don was not with his wife and their visitors. Upon Don's return, Luana told him that defendant, as he approached Madison for a hug, had licked her on the neck or face. After defendant made two lewd comments toward Luana, Don approached defendant and told him he had to leave. Don had "anger in [his] voice" but did not yell and did not attempt to strike defendant. After Don asked defendant to leave a second time, defendant struck him with two punches; the second punch struck the right side of Don's face. Defendant then reached down beside the couch and struck Don on the left side of the head with "his full bottle of beer." After Don fell to the floor, defendant fell on top of him and "just started punching away." Don had blood on the left side of his head running down to his shirt. He was treated by paramedics who later arrived at the scene.

4

## II.    *Defense Evidence*

Deputy Sheriff Stuart Howard responded to the scene on the evening of April 5, 2013.  He interviewed Luana Kellar.  Luana told Deputy Howard that Madison had told her that defendant had licked her (Madison) on the neck while he was hugging her.  Deputy Howard testified that Luana had not told him that she had personally seen defendant licking Madison's neck, and Luana did not say anything about defendant having kissed Madison.

On cross-examination, Deputy Howard testified that he did not specifically ask Luana whether she had seen defendant licking and kissing Madison.  Deputy Howard also testified that defendant appeared to be intoxicated but was able to control himself.

## PROCEDURAL BACKGROUND

On August 1, 2013, the Santa Clara County District Attorney's Office filed an information charging defendant with assault with a deadly weapon (§245, subd. (a)(1); count 1), a felony, and annoying or molesting a child, a misdemeanor (§ 647.6, subd. (a)(1); count 2).  The prosecution alleged further that defendant had suffered one prior strike (§§ 667, subds. (b)-(i), 1170.12 ):  assault with a deadly weapon (§245, subd. (a)(1)).

On September 27, 2013, a jury found defendant guilty of both counts.  In a bench trial, the court found the strike allegation true.  Defendant thereafter filed a motion asking the court to exercise its discretion to dismiss the prior strike allegation in accordance with *People v. Superior Court (Romero)* (1996) 13 Cal.4th 497 (*Romero*), or, in the alternative, to reduce the count 1 conviction to a misdemeanor pursuant to section 17, subdivision (b).  The People opposed the motions.  On February 7, 2014, the court denied the *Romero* motion and the alternative motion to reduce the count 1 conviction to a misdemeanor.  On the same day, the court imposed a sentence of six years on count 1, consecutive to a five-year term for the prior strike allegation, for an aggregate prison term of 11 years.  The court also imposed a 180-day concurrent sentence on count 2.

DISCUSSION

I.      *There Was No Prejudicial Prosecutorial Error*

        A.      Applicable Law

" 'It is settled that a prosecutor is given wide latitude during argument.  The argument may be vigorous as long as it amounts to fair comment on the evidence, which can include reasonable inferences, or deductions to be drawn therefrom.  [Citations.] . . . ' [Citation.]  'A prosecutor may "vigorously argue his case and is not limited to 'Chesterfieldian politeness' " [citation], and he [or she] may "use appropriate epithets warranted by the evidence." ' [Citations.]" (*People v. Wharton* (1991) 53 Cal.3d 522, 567-568; see also *People v. Cole* (2004) 33 Cal.4th 1158, 1203.)  But a prosecutor " 'may not assume or state facts not in evidence [citation] or mischaracterize the evidence [citation].' [Citation.]" (*People v. Harrison* (2005) 35 Cal.4th 208, 249, quoting *People v. Valdez* (2004) 32 Cal.4th 73, 133-134.)

Prosecutorial error (oftentimes referred to as prosecutorial misconduct)[3] may take a number of forms.  In the context of error occurring during a prosecutor's argument, it may consist of (without limitation) mischaracterizing or misstating the evidence (*Hill*, *supra*, 17 Cal.4th at p. 823); referring to facts not in evidence (*id.* at pp. 827-828); or misstating the law, particularly where done in an effort to relieve the prosecution of responsibility for proving all elements of a crime beyond a reasonable doubt (*id.* at pp. 829-830).  The conduct complained of need not be intentional.  Our high court has made clear that bad faith is no longer a requirement of a claim of prosecutorial error.  (*Id.* at pp. 822-823; see also *People v. Bolton* (1979) 23 Cal.3d 208, 213.)

---

[3] "We observe that the term prosecutorial 'misconduct' is somewhat of a misnomer to the extent that it suggests a prosecutor must act with a culpable state of mind.  A more apt description of the transgression is prosecutorial error." (*People v. Hill* (1998) 17 Cal.4th 800, 823, fn. 1 (*Hill*).)

6

The standards for reviewing a claim of prosecutorial error have been summarized by our high court as follows:  "A prosecutor's rude and intemperate behavior violates the federal Constitution when it comprises a pattern of conduct 'so egregious that it infects the trial with such unfairness as to make the conviction a denial of due process.' [Citations.]  But conduct by a prosecutor that does not render a criminal trial fundamentally unfair is prosecutorial misconduct under state law only if it involves ' "the use of deceptive or reprehensible methods to attempt to persuade either the court or the jury." ' [Citations.]" (*People v. Espinosa* (1992) 3 Cal.4th 806, 820.)  Generally speaking, the defense must make a timely objection and a request for an admonition to cure any harm to preserve an appellate challenge based upon prosecutorial error.  (*People v. Frye* (1998) 18 Cal.4th 894, 969, disapproved on another ground in *People v. Doolin* (2009) 45 Cal.4th 390, 421, fn. 22.)

We engage in a two-step process to review a claim based upon improper argument by the prosecution.  We "determine first whether misconduct has occurred, keeping in mind . . . ' "[t]he prosecution has broad discretion to state its views as to what the evidence shows and what inferences may be drawn therefrom" ' [citation], and that the prosecutor 'may "vigorously argue his case" . . . , "[using] appropriate epithets warranted by the evidence." ' [Citation.]" (*People v. Welch* (1999) 20 Cal.4th 701, 752-753 (*Welch*).)  Second, assuming we find the existence of prosecutorial error, we assess whether the error was prejudicial.  If the error is a violation of federal constitutional principles, we apply the *Chapman* standard (*Chapman v. California* (1967) 386 U.S. 18, 24), wherein "the [appellate] court must be able to declare a belief that [the error] was harmless beyond a reasonable doubt." (See *People v. Vargas* (1973) 9 Cal.3d 470, 478 [prosecutorial error by commenting on defendant's refusal to testify in violation of *Griffin v. California* (1965) 380 U.S. 609, reviewed under *Chapman* standard].)  Prosecutorial error is evaluated under the *Chapman* standard when " ' "a prosecutor's intemperate behavior is sufficiently egregious that it infects the trial with such a degree of

7

unfairness as to render the subsequent conviction a denial of due process, [such that] the federal Constitution is violated." ' [Citations.]" (*People v. Shazier* (2014) 60 Cal.4th 109, 127 (*Shazier*).)  But if the prosecutor's conduct does not render the trial fundamentally unfair, it " ' "may still constitute misconduct under state law if it involves the use of deceptive or reprehensible methods to persuade the trial court or the jury." [Citation.]' [Citation.]" (*Ibid.*)  In such instances of state-law prosecutorial error, we apply the standard in *People v. Watson* (1956) 46 Cal.2d 818, 836 (*Watson*) to determine its prejudicial impact, and we will reverse "only if it is reasonably probable the trial outcome was affected.  [Citation.]" (*Shazier*, at p. 127; see also *People v. Pensinger* (1991) 52 Cal.3d 1210, 1250 [prosecutor's improper argument appealing to passion and prejudice of jury not prejudicial because there was "no reasonable probability that a result more favorable to defendant would have been reached if the court had admonished the jury"].)  Here, assuming any prosecutorial error, it is state-law error for which the *Watson* standard would apply.

    B.  Defendant's Claim of Prosecutorial Error

     *1.  Background*

  Defendant contends the prosecutor suggested to the jury in argument "that evidence it ha[d] not seen or heard nonetheless exist[ed] and establishe[d] the defendant's guilt."  Specifically, defendant asserts the prosecutor alluded to evidence not before the court that showed defendant "had an unnatural sexual interest in children."  This conduct was prejudicial, defendant argues, because his trial counsel argued effectively that "there was no evidence establishing that [defendant's] conduct towards Madison was motivated by an unnatural or abnormal sexual interest in children, which is a required element of the [misdemeanor child annoyance] offense."

  We first note that defendant in his appellate briefs repeatedly states that one element of the child annoyance offense was that defendant's actions were motivated by an "unnatural or abnormal sexual interest in *children*."  (Italics added.)  He also contends

8

the court so instructed concerning this element. Defendant misstates the law and the trial court's instruction. The crime proscribed by section 647.6, subdivision (a) involves annoying or molesting a child under 18 years old consisting of "(1) conduct a ' "normal person would unhesitatingly be irritated by" ' [citations], and (2) conduct ' "motivated by an unnatural or abnormal sexual interest" ' in the *victim*." (*People v. Lopez* (1998) 19 Cal.4th 282, 289, italics added; see also *People v. Shaw* (2009) 177 Cal.App.4th 92, 102-104 [trial court did not err when it instructed that defendant's conduct must have been motivated by " 'an unnatural or abnormal sexual interest in the *child*' (italics added), instead of referencing the protected class as a group, children"].) And pursuant to CALCRIM No. 1122—specifying that the defendant's conduct be "motivated by an unnatural or abnormal sexual interest in the child"—the trial court instructed that the second element required to establish the child annoyance crime was that "[t]he [defendant's] acts or conduct were motivated by an unnatural or abnormal sexual interest in Madison S."

We turn next the passage of the prosecution's closing argument that defendant contends constituted prosecutorial error. The prosecutor argued: "So, yes, we don't have any specific testimony, and you're not going to get it[;] you're not entitled to it[.] But we have the circumstances which you can consider. You have your common sense. When you think about all those things and you think about the evidence you've heard, it's clear that [defendant] had a sexual interest in Madison at that time on that date when he hugged her, when he kissed her, when he licked her."

After closing argument was concluded, defense counsel asserted an objection. He argued the prosecutor's argument "suggested falsely to the jurors" there was evidence on the issue of defendant's "abnormal sexual interest in children," but that the jurors were "for some reason legally not entitled to hear it." Counsel moved for a mistrial, which the court denied.

9

Before a recess, defense counsel made an oral request that the jury be advised that defendant had no history of sex offenses.  There is no indication the court ruled on this request, and it appears it was superseded by defendant's later submission of a proposed written curative instruction.  Defendant does not claim on appeal that the court erred by failing to grant his oral request for a curative instruction, and has therefore abandoned any such claim.  (*People v. Combs* (2004) 34 Cal.4th 821, 845 [party abandons claim of error by failing to raise it on appeal].)

After a recess, defendant submitted a proposed written curative instruction that would have advised the jury that the prosecution's comment that the jury "was not entitled to hear certain evidence . . . was erroneous."  The proposed instruction would then have said:  "Rest assured you have heard all of the evidence in this case.  No evidence has been concealed or kept from you for any reason."  The court denied the request.  It instead admonished the jury as follows:  "I want to remind you jurors that the standard of proof as to all elements of the offense is beyond a reasonable doubt as defined.  Arguments by the attorneys are just that:  arguments."  Defense counsel objected to the admonishment, arguing it failed to address the prosecutor's argument to which defendant had objected.

## 2.    *No Prosecutorial Error*

In addressing defendant's appellate contentions, we bear in mind the following cautionary statement by the California Supreme Court:  "Although defendant singles out words and phrases, or at most a few sentences, to demonstrate misconduct, we must view the [prosecutor's] statements in the context of the argument as a whole.  [Citation.]" (*People v. Dennis* (1998) 17 Cal.4th 468, 522 (*Dennis*).)  And in assessing defendant's claim that the prosecutor made improper arguments to the jury, we "must determine at the threshold how the remarks would, or could, have been understood by a reasonable juror.  [Citations.]" (*People v. Benson* (1990) 52 Cal.3d 754, 793.)

10

Here, to determine whether there was prosecutorial error, we consider the prosecutor's arguments in their totality, particularly those concerning the element of the offense that "defendant's conduct was motivated by an unnatural or abnormal sexual interest in [Madison]." (CALCRIM No. 1122.) The prosecutor stated during his opening argument that defendant's conduct of holding onto Madison tightly, kissing her on the neck, and licking her along the jawline was motivated by his wanting "some sexual gratification from her." Later, in the same argument, the prosecutor said: "Element number two: The acts or conduct were motivated by an unnatural or abnormal sexual interest in Madison. [¶] Now, you will not and did not and do not have to hear from Mr. Simpson. It is his constitutional right not to testify. So to . . . answer that question you're going to have to consider the . . . evidence, what you heard, what the pictures suggest. And when you consider that testimony, of course he was motivated by an unnatural and abnormal sexual interest in Madison. There's no other reason to kiss someone in that type of way. There's no reason to lick someone all along their [jawline] unless it was sexual. [¶] She told you and you saw her. Let's be frank. She's 13 years old. She is tall for a 13-year-old eighth grader and she's developed . . . . [Defendant is] probably a couple inches taller than her. And as she told you, for them to be face to face, he would have to bend down. He bent down for a reason. He's sexually thinking about Luana, and when he couldn't have her he's sexually thinking and wanting something from Madison. And because she's a 13-year-old vulnerable little girl, he went out and took it."

During his closing argument—and prior to making the argument to which defendant objected—the prosecutor addressed defense counsel's contention that there was "no evidence . . . whatsoever" that defendant's actions were motivated by an unnatural or abnormal sexual interest in Madison. The prosecutor argued: "[Defense counsel] said you heard no evidence regarding the specific mental state of [defendant's] having a sexual interest in Madison. And you haven't heard any direct evidence of that, and it's highly unlikely that you ever would; but that's why we have circumstantial

11

evidence. And as I told you before, you can weigh all the circumstances from which you've heard, the testimony of Madison, the testimony of Luana, the testimony of Don[,] to evaluate those circumstances and make a determination regarding the elements of the crime. And when you evaluate those circumstances, the only reasonable interpretation is the reason why he kissed her and licked her and hugged her tight was because he had a sexual interest in her at the time."

In response to defense counsel's argument that defendant's actions resulted from his intoxication rather than from an unnatural or abnormal sexual interest in Madison, the prosecutor argued that the evidence showed that while defendant had been drinking, he was in control of his faculties. The prosecutor argued: "So he's been drinking. He's feeling frisky, for lack of a better word, first towards Luana and then towards Madison. I think his drinking increased his need and sexual desires toward the woman. But in this time it wasn't towards just the woman, it was towards a girl. And that's why his conduct was criminal. That drinking, that sexual interest was focused on a girl. And he acted on it. And he acted on it by licking her and by kissing her."

Immediately after addressing the intoxication issue, the prosecutor argued: "So, yes, we don't have any specific testimony, and you're not going to get it[;] you're not entitled to it[.] But we have the circumstances which you can consider. You have your common sense. When you think about all those things and you think about the evidence you've heard, it's clear that [defendant] had a sexual interest in Madison at that time on that date when he hugged her, when he kissed her, when he licked her."

Viewing this last argument in the context of the prosecution's entire opening and closing arguments, we conclude there was no prosecutorial error. The prosecutor's reference to "specific testimony" that was not elicited at trial that the jurors would not "get" was potential testimony from defendant. Indeed, the prosecutor advised the jury in his opening argument that defendant had a constitutional right not to testify, and that he had exercised that right. He did so specifically in the context of discussing evidence that

12

defendant's acts were motivated by an unnatural or abnormal sexual interest in Madison. Defense counsel likewise argued that defendant had a constitutional right not to testify, and the court so instructed the jury shortly after arguments concluded. Therefore, in the context of the prosecution's entire argument (*Dennis*, *supra*, 17 Cal.4th at p. 522), we find that a reasonable juror would have interpreted the prosecutor's comment about "specific testimony" that it did not hear as being potential testimony by defendant, not to any other evidence it was "not going to get" or that it was "not entitled to" hear. In this respect, we agree with the trial judge's assessment of the "specific testimony" remark. The trial judge indicated that, in the context of the argument, the prosecutor's comment about "specific testimony" was, "however inartfully put," a reference to potential testimony from defendant. The trial judge continued by observing that, "bearing in mind . . . [that defendant] has a constitutional right not to testify," such testimony "would be direct evidence of his state of mind."

As noted, the prosecution has wide latitude during argument to comment on the evidence and draw inferences therefrom, even if those inferences are not reasonable, since it is for the jury to decide whether the argued inferences are in fact reasonable. (*People v.Thornton* (2007) 41 Cal.4th 391, 454.) The prosecution's commentary concerning the absence of evidence presented by a defendant is appropriate so long as it does not include arguments that shift the burden of proof to a defendant or comment on a defendant's failure to testify. (*People v. Ratliff* (1986) 41 Cal.3d 675, 691 (*Ratliff*).) It is appropriate for the prosecution to provide fair comment upon the evidence presented by the defendant. (*People v. Jones* (1997) 15 Cal.4th 119, 186, overruled on other grounds in *Hill*, *supra*, 17 Cal.4th at p. 823, fn. 1.) Included among such fair commentary is a prosecutor's indication concerning the absence of evidence presented by the defendant to show that he or she did not commit the charged offenses. (*Ratliff*, at p. 691; see also *People v. Szeto* (1981) 29 Cal.3d 20, 34 [prosecutor's comment regarding the defendant's failure "to introduce material evidence or to call logical witnesses" is not improper].)

13

The prosecutor's argument here that there was evidence showing defendant's conduct was motivated by an unnatural or abnormal sexual interest in the victim, notwithstanding the absence of direct evidence of intent from defendant because of his proper assertion of his constitutional right not to testify, was proper commentary on the evidence. Furthermore, any ambiguity in the prosecutor's objected-to comments was mitigated by repeated instructions from the court concerning the jury's role and the admonitions relating to the arguments of counsel. At the outset of the trial, the court gave a preinstruction that any statements by counsel were not evidence. During the prosecutor's closing argument, and following an objection by defense counsel, the court once again advised the jury that it was responsible for deciding the facts, and that "[t]his [was] argument by [counsel]." At the outset of its instructions, the court advised the jury that "[a]rguments by the attorneys are just that: arguments." And the court instructed the jury that it was required to "determine what facts have been proved from the evidence received in the trial and not from any other source." (See CALJIC No. 1.00.) The court also instructed the jury that it must "decide all questions of fact in this case from the evidence received in this trial and not from any other source." (See CALJIC No. 1.03.) The jury was thus repeatedly advised that it could consider only the evidence presented before it and that counsel's arguments were not evidence. A jury is presumed to have followed the court's instructions. (*People v. Houston* (2005) 130 Cal.App.4th 279, 308.)

Considering the prosecutor's objected-to comments in the context of his entire argument, we conclude the jury could not have reasonably construed the prosecution's isolated comment about "specific testimony" as a representation that there existed other evidence it did not hear concerning defendant's motivation for his actions toward the victim. "[J]uries generally understand that counsel's assertions are the 'statements of advocates.' " (*People v. Gonzalez* (1990) 51 Cal.3d 1179, 1224, fn. 21, superseded by statute on another ground as stated in *In re Steele* (2004) 32 Cal.4th 682, 691.) Moreover, " 'a court should not lightly infer that a prosecutor intends an ambiguous

14

remark to have its most damaging meaning or that a jury, sitting through lengthy exhortation, will draw that meaning from the plethora of less damaging interpretations.' [Citations.]"  (*Ibid.*; see also *People v. Carter* (2005) 36 Cal.4th 1114, 1205 ["the prosecutor's brief remark was fleeting and of marginal significance'].)

For these reasons, we conclude there was no prosecutorial error in this case.

DISPOSITION

The judgment is affirmed.

_____

                                               Márquez, J.

WE CONCUR:

_____

Bamattre-Manoukian, Acting P.J.

_____

Mihara, J.

<u>People v. Simpson</u>
H040725